[See Case No. 12,297a.]

## Case No. 4,482.

ENDICOTT et al. v. RENAULD et al.

[10 Ben. 582.][1]

District Court, S. D. New York. Oct., 1879.

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

R. D. Benedict, for libellants.

H. E. Davies and I. Phillips, for respondents.

CHOATE, District Judge. This is a libel in personam by [Charles G. Endicott and others] the owners of the schooner Susan B. Ray against [Peter A. G. Renauld and others] the consignees of the cargo to recover a balance of freight moneys alleged to be due upon the delivery of the cargo in New York. The cargo consisted of 236 hogsheads, 488 boxes and 2,510 bags of sugar. It was shipped in Havana under bills of lading by which it was to be delivered "in the like good order and condition" as when shipped, "the dangers and accidents of the seas and navigation of whatever nature or kind excepted." The libel alleges that the sugars were "duly delivered in like order in which they were received, the dangers and accidents of the seas only excepted." The answer avers "that the sugars were delivered reduced in quantity and in a damaged condition; that the loss and damage were not caused by perils of the sea" but by the "carelessness, unskillfulness and wrongful acts of the master, officers and seamen of the vessel" and "by defective dunnage, stowage and improper handling and want of care of the sugars" on the voyage. The loss thus attributed to the fault of the vessel is stated in the answer to be $640.68. The whole amount of the freight is admitted to be $1827, and the amount already paid to be $900. The answer further avers that defendants are "willing to pay in discharge of their liability for the freight, the further sum of $286.32," which sum they "have hitherto tendered" to the libellants. On the trial it was admitted that the respondents offered to the libellants this sum of $286.32, if accepted in full discharge of libellants' claim, and that libellants refused to accept it on that condition. There was no other proof of a tender.

It appeared by the proofs, that when the cargo was discharged, there were found to be one hundred and ninety-three bags damaged; of these twelve were empty, or nearly so, and the rest more or less reduced in quantity or wet with salt water. There were also twelve boxes damaged, one being empty and others partly empty. There was really no doubt upon the evidence, that the injury was caused by sea water. The vessel had two decks and the sugar that was damaged was stowed in the lower hold. The hogsheads were stowed at the bottom. On top of the hogsheads were the bags and boxes. The hogsheads were not damaged.

The vessel had a centre-board, and the damaged bags and boxes were found adjoining to or near the trunk of this centre-board, which rose about nine feet high in the hold.

The question to be determined is whether the damage was caused by a peril of the sea or by insufficient dunnage.

The vessel arrived in July, 1877. The master and the second mate and one of the seamen of the vessel were examined before the trial in April, 1878. The testimony of the master was to the effect that there were eleven inches of dunnage at the bottom by the keelson, and that it extended up to the bilges, but not so deep; that the dunnage consisted of pine wood and boards; that there was dunnage along each side of the centre-board trunk, pine wood standing up and down and boards against the wood running fore and aft; that this dunnage was kept in place by the pressure of the cargo against it. The master also testifies that a part of the passage was very rough and the rest good weather; that the vessel did not leak more than usual; that the pumps were tried every two hours; that during the rough weather there was a great deal of steam from the sugar, making it very hot in the cabin; that he saw no signs of water in the vessel from leak; that he and the second mate superintended the discharge of the cargo; that he thought then, and still thought, at the time of the discharge, that the damage was caused by sweat. The second mate testified to the same effect as to the dunnage; also that they had "a middling rough passage home sometimes, and sometimes pleasant weather;" that she leaked no more than usual; that the pumps were attended to every two hours; that the hatches were well secured, caulked tight, soaked and tarred; that they showed no appearances of a leak in or around them; that the deck was tight and showed no indication of leak; that she hardly ever leaked enough for the pumps to catch it. One of the crew also testified that he helped stow the cargo; that there were some boards used as dunnage; that the boards were placed on the wood along the well of

the vessel; that they had a rough passage occasionally; .hat the vessel did not leak any to speak of; that she leaked some; that the pumps were tried every hour; that they did not show that she leaked much; that she leaked "no more than common;" that there was .dunnage between the centre-board trunk and the cargo, consisting of pine wood and boards; that the wood was Virginia pine wood about four feet long.

Upon the trial the stevedore who discharged the cargo testified that there was dunnage along the sides of the centre-board trunk and in front of it from the bottom to the top, consisting of wood up and down and boards across the wood; that this dunnage was from eight to ten inches thick. He also testified that he found, when they came to break down the cargo by the forward part of the centre-board trunk, that the oakum had started and that there were indications of a leak. The cooper employed by the vessel in New York also testified that there was dunnage against the centre-board trunk, consisting of wood and boards. He could give no positive testimony as to its thickness.

The claimants called two witnesses, the cooper employed by the consignees of the cargo and his journeyman, who testified, positively, that there was no dunnage against the centre-board trunk; that there was nothing between this trunk and the cargo. I think, however, that the weight of evidence is decidedly with the libellants on this point, and that these two witnesses are mistaken. But the question still remains whether that dunnage was sufficient. That there was dunnage there, consisting of wood up and down, with boards across the wood, may be assumed as a fact proved. Its thickness is not proved. In judging of its sufficiency, it is necessary to consider, not only what is the proof as to the dunnage being there, but, also, how far it protected the cargo, and whether the cargo was in fact exposed to any peril of the sea which will account for the injury to the cargo. For, if it was exposed to no such peril, then, from the fact that the cargo was wet, it might be inferred that the dunnage was insufficient.

In the present case there is not sufficient evidence that there was any peril of the sea. It is true there was some leakage around this centre-board trunk, but it is obvious that it was very trifling. The very fact that it was thought necessary to have dunnage there at all, shows that it is regarded as possible that some water may get in to the vessel at this place. But the evidence of the master, second mate and seaman, is explicit that there was no more leak than usual upon this voyage; that in fact the vessel was remarkably tight and free from leak. There was no leak of any account, as shown by the pumps. A ship must be dunnaged so as to protect the cargo even in rough weather, if the vessel springs no serious leak. And if the construction of a vessel with a centre-board is such that the cargo lying next to it is liable to be damaged in rough weather by water oozing in through the seams of the centre-board, but without springing any serious leak, the dunnage against and around the centre-board trunk must be sufficient to protect it, if it has to be dunnaged two feet deep. As the ship rolls, undoubtedly the water so oozing in is liable to be thrown off from the trunk one way and the other. But the vessel must be prepared for rolling in rough weather, and in this case the weather was not exceptionally bad. I think it clear that the dunnage was insufficient to protect the cargo against ordinary leakage at this point and such as should be expected in almost any ocean voyage, and that there was no other leakage. This part of the cargo may be very difficult to protect against even a slight leak, but this is not the fault of the shipper. It may be the misfortune of the ship in having this peculiar construction, and this is a danger against which the ship has undertaken to guard the cargo.

That there was no serious or unusual leak is, I think, shown, not only by its description so far as testified to by the witnesses, but also by the conduct of the master, who, when he claimed the balance of his freight, declined to make a declaration that the damage was caused by sea water. He thought then that the damage was .caused by sweat, a theory which has been entirely disproved. The sugar was shown to be dry centrifugal sugar. The libel sworn to by the master merely states that the sugars "were delivered in like good order, the dangers and accidents of the seas only excepted." Whether they were delivered without damage, or being damaged, that damage was caused by sea peril, was left wholly uncertain on the libel; it left the libellants at liberty to prove either of these two states of the case. The transaction between the master and the agent of the consignees, as testified to by the master himself, shows that he was unwilling to take the ground that they were injured by sea peril. And in his testimony he did not take this ground. Springing a leak in rough weather may be a peril of the sea which will exonerate the ship, but it must be a leak more serious than what is here described as the usual or common leak and as one which the pumps would hardly reach.

Therefore there must be a decree giving the respondents their damages, to be deducted from the balance of freight due.

The tender made is insufficient under rule 72 of this court, because not made good by depositing the amount in court, if it was any tender at all. The question of costs, however, is reserved till the respondents' damages have been assessed. Decree accordingly.